**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DAVID ZEHNER,**

                              **Plaintiff,**

**v.**                                                    **5:11-CV-1202 (NAM/ML)**

**JORDAN-ELBRIDGE BOARD OF EDUCATION,**
**JORDAN-ELBRIDGE CENTRAL SCHOOL DISTRICT,**
**MARY ALLEY, DIANA FOOTE, JEANNE PIEKLIK,**
**CONNIE DRAKE, PENNY FEENEY, LAWRENCE ZACHER,**
**DANNY LOUIS MEVEC, and JAMES FROIO,**

                              **Defendants.**
_____

**APPEARANCES:**

Stephen Ciotoli, Esq.
O'Hara, O'Connell Law Firm
7207 East Genesee Street
Fayetteville, NY 13066
_Attorney for Plaintiff_

Frank W. Miller, Esq.
Charles C. Spagnoli, Esq.
Office of Frank W. Miller
6575 Kirkville Road
East Syracuse, NY 13057
_Attorney for Defendants Jordan-Elbridge Board of Education,_
_Jordan-Elbridge Central School District, Mary L. Alley, Diana Foote,_
_Jeanne Pieklik, Connie Drake, Penny L. Feeney, and James R. Froio_

Danny Louis Mevec, Esq.
Mevec Law Firm, PLLC
206 North Townsend Street
Syracuse, NY 13203
_Pro Se Defendant_

Jeffrey E. Hurd, Esq.
Judith B. Aumand, Esq.
Burke, Scolamiero Law Firm
7 Washington Square
Albany, NY 12205
_Attorneys for Lawrence J. Zacher_

**Hon. Norman A. Mordue, Senior U.S. District Court Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

On September 29, 2015, the Court issued a Memorandum-Decision and Order

addressing summary judgment and other motions related to Plaintiff's claims under 42 U.S.C. §

1983 for First Amendment retaliation (based on freedom of speech and freedom of association),

and for violation of Section 3028-d of the New York State Education Law.  (Dkt. No. 256).  As

relevant here, the Court granted the motions for summary judgment by the Defendants (Dkt.

Nos. 162, 164, 172), and denied Plaintiff's cross-motion for summary judgment (Dkt. No. 197).

(*Id.*).  Consequently, the Court dismissed Plaintiff's case in its entirety.  (*Id.*).

After Plaintiff appealed, the Second Circuit affirmed the Court's judgment in part, but

also vacated in part and remanded for further proceedings.  (Dkt. No. 261; *see also Zehner v.*

*Jordan-Elbridge Bd. of Educ.*, 666 F. App'x 29, 31 (2d Cir. 2016)).  Subsequently, Defendants

submitted several requests that, on remand, the Court consider certain arguments that it did not

address in the September 29, 2015 Memorandum-Decision and Order.  (Dkt. Nos. 266, 268–69).

Plaintiff opposed these requests.  (Dkt. Nos. 270–72).  Now that the Second Circuit has held that

summary judgment was not warranted on the grounds relied on by this Court, it is necessary to

return to the record and consider whether to grant summary judgment based on any other ground

asserted by Defendants in their original motion papers.  If any Defendant presented a

previously-unconsidered meritorious alternative ground for summary judgment dismissing a

cause of action, there is no reason why Plaintiff should be permitted to proceed to trial against

that Defendant on that cause of action.  The Court will only consider those arguments that were

previously before it but not decided on summary judgment. To the extent that the letter requests may seek to raise new arguments, the Court will not consider them.

## II.     BACKGROUND

### A.  Relevant Individuals

Plaintiff began working at the Jordan-Elbridge Central School District as its High School Principal in February of 2006, and he became tenured in that position around January of 2009. (Dkt. No. 193-1, ¶ 13). The District hired Defendant Mevec as its general counsel on or about October 1, 2003. (Dkt. No. 194-1, ¶ 14). Defendant Zacher was appointed as the Interim Superintendent of the School District on November 3, 2010 and served until May 13, 2011. (Dkt. No. 195-1, ¶ 3). Defendant Froio has been the Superintendent since July 1, 2011. (Dkt. No. 214-32, ¶ 2). Defendant Alley served on the School District's Board of Education from July 1, 2005 to June 30, 2011, and she was the Board's President from July 1, 2009 to June 30, 2011. (Dkt. No. 167, ¶ 3; Dkt. No. 214-33, ¶ 2). Defendant Foote served on the Board from around July 1, 2008 to June 30, 2011. (Dkt. No. 168, ¶ 3). Defendant Drake served on the Board from July 1, 2009 to June 30, 2012. (Dkt. No. 214-29, ¶ 2). Defendant Pieklik served on the Board from July 1, 2002 to June 30, 2011. (Dkt. No. 214-31, ¶ 2). Defendant Feeney served on the Board from July 1, 2003 to June 30, 2012. (Dkt. No. 214-34, ¶ 2).

### B.  Job Performance Review

Plaintiff claims that on May 14, 2008, he received a job performance review which warned him to "be cautious about your alliances." (Dkt. No. 193-1, p. 8). Plaintiff interpreted this as a warning based on his support for former Elementary School Principal Janice Schue, who had been removed from her position. (*Id.*).

### C.  Counseling Memos

In 2009 and 2010, Plaintiff received a series of counseling memos regarding alleged issues with his job performance as Principal. These memos were authored by non-defendants Sue Gorton and Marilyn Dominick during their tenures as Superintendent. Plaintiff disputes the facts and findings in many of the memos and claims that they were acts of retaliation and not based on the alleged job performance issues. (Dkt. No. 193-1, p. 7). Plaintiff claims that he never received a counseling memo in his career as a school administrator until this time period. (*Id.*, p. 95).

On June 30, 2009, Plaintiff received a memo about missing digital cameras and his alleged failure to respond to an email about their return; he was counseled to investigate the process and monitoring system for the return of other school items. (Dkt. No. 166-1, p. 43). On September 28th, Plaintiff received a memo critiquing memos he had written to other school employees; he was counseled to "develop a plan to improve your written communication skills." (*Id.*, p. 39). On October 1st, Plaintiff received a memo from Superintendent Dominick regarding his alleged "failure to comply with my requirement to submit your annual goals in the proper form . . . and your failure to schedule a monthly meeting with me for August and September. (*Id.*, p. 42).

On January 21, 2010, Plaintiff received another memo regarding his alleged mishandling of a student discipline issue. (Dkt. No. 166-1, pp. 16–17). Plaintiff allegedly embarrassed a student and caused him to become angry. (*Id.*, p. 16). He was counseled to change his approach "from sarcasm to one that respects students and assists them in working out their challenges." (*Id.*, p. 17). And it was noted that if another such incident happened, "a more thorough investigation, including the interviewing of witnesses, will take place and a more formal reprimand process will be completed." (*Id.*). On February 4th, Plaintiff received a memo

critiquing his evaluations of certain teachers. (*Id.*, p. 3). The memo stated that "[t]here is a systemic problem with what good instruction is supposed to look like," and that Plaintiff was not doing enough to fix the problem. (*Id.*).

On March 29, 2010, Plaintiff received a memo regarding "inappropriate comments" made by Plaintiff. (Dkt. No. 166-1, p. 35). The memo stated that the Superintendent had "turned the further investigation of this matter and other similar incidents over to school district counsel, Dan Mevec." (*Id.*). The memo also indicated that Plaintiff was receiving private counseling for his "admitted lack of sensitivity," and requested him to attend additional sensitivity training. (*Id.*).

On April 6th, Plaintiff received a memo regarding a written complaint from a ninth-grade student, which indicated that Plaintiff had spoken negatively about the student to a student from another school. (Dkt. No. 166-1, p. 28). The memo stated that: "By talking to someone about a Jordan Elbridge student, you have violated our student's privacy and defamed his character." (*Id.*). The Superintendent added that: "I had spoken with you several weeks ago and as recent as the last couple of weeks about putting an end to your inappropriate comments, both inside and outside of school. Yet you continue to practice this behavior. I am very concerned that you may have an inability to discern what is acceptable and what is not." (*Id.*).

On May 6th, Plaintiff received a memo about hiring a hypnotist for an after-prom party. (Dkt. No. 166-1, pp. 22–23). Plaintiff was accused of misrepresenting the situation to the Superintendent and counseled to improve his communication. (*Id.*). Plaintiff received additional memos on May 12th, May 20th, and May 26th regarding alleged issues with poor evaluations of staff under his supervision, "improper handling of copy services," and not following procedures in enrolling his daughter at school in the district. (*Id.*, pp. 18–20).

On June 7th, Plaintiff received a memo regarding "serious concerns" about his "ability to communicate effectively in writing," and stating that certain written teacher tenure evaluations that he had written contained "little evidence of any kind of attention to spelling, the editing process or sentence structure." (Dkt. No. 166-1, p. 13). Plaintiff responded to the memo by saying that he is "learning disabled in the area of written expression" and has "difficulty in this area of communication." (*Id.*, p. 14).

On August 9th, Plaintiff received another memo about his alleged "failure to follow the established process for the selection of new textbooks." (Dkt. No. 166-1, p. 10). According to the memo, Plaintiff's presentation of a new school textbook to the Board "was poorly planned and executed" and an inaccurate purchase order was submitted for the textbook. (*Id.*). The memo further stated that Plaintiff's actions were "not acceptable," and that he "must improve [his] attention to these details." (*Id.*). Plaintiff disputed some facts in the memo but acknowledged that the presentation was substandard. (Dkt. No. 193-7, p. 88).

On September 10th, Plaintiff received a memo regarding his issuance of a diploma to a student "without proper documentation of course work needed to graduate." (Dkt. No. 166-1, p. 8). The memo stated that Plaintiff "ignored the system presented to the board, which was informally approved, and have purposefully made a decision to bend the rules." (*Id.*, p. 9). The memo also stated, in meeting with the Superintendent, that Plaintiff's "negative tone was not appropriate or acceptable in any conversation with a colleague." (*Id.*, p. 8). The Superintendent added that: "In the future, you will address me and all colleagues appropriately. To clarify, this means that you will not raise your voice, use sarcasm, a negative tone or tone that can be construed as bullying with any colleague. This behavior will not be tolerated and will be formally addressed by me." (*Id.*).

On September 15th, Plaintiff received yet another counseling memo, this time stating that his "recent handling of a student discipline matter in which three students were found to have cigarettes in their possession at the high school during school hours is unacceptable." (Dkt. No. 166-1, p. 7). The memo stated that by failing to discipline the students, Plaintiff showed "blatant disregard for established procedures and rules." (*Id.*). Plaintiff testified that he threatened to discipline the students but ultimately returned the cigarettes at the end of the day. (Dkt. No. 193-7, pp. 120–21). On September 21st, Plaintiff received a memo regarding his alleged "failure to proofread written communication." (Dkt. No. 166-1, p. 3).

## D.  February 2010 Meeting

Plaintiff testified that in February 2010, he met with Superintendent Dominick, Board Member Alley, and General Counsel Mevec about his participation in a Facebook group supporting former principal Janice Schue. (Dkt. No. 193-7, pp. 131–33). Plaintiff had objected to the District's removal of Schue from her position. (*Id.*). Plaintiff testified that he was told "if I didn't remove myself from the Facebook group, I would face charges." (*Id.*, p. 133). Defendant Alley testified that they discussed Plaintiff's allegedly improper grade changes, and Defendant Mevec told Plaintiff that if he did not resign, they would go to the Attorney General. (Dkt. No. 193-19, p. 24).

## E.  First Article 78 Proceeding

On August 25, 2010, Plaintiff commenced an Article 78 proceeding to challenge the Board's alleged violation of New York's Open Meetings Law when it appointed a new interim superintendent, Sue Gorton, in Executive Session without sufficient notice and comment. *See Mtr. of Zehner v. Board of Educ. of Jordan-Elbridge Cent. Sch. Dist.*, 958 N.Y.S.2d 311 (Table), 2010 WL 3895339 (N.Y.Sup. Oct. 1, 2010). In a decision dated October 1, 2010, the

local court determined that the Board had violated the Open Meetings Law and rescinded the appointment of Gorton as interim superintendent. *Id.*

### F. Plaintiff's Suspension

On September 21, 2010, Superintendent Dominick sent Plaintiff a letter notifying him of his suspension. (Dkt. No. 166-1, p. 2). The letter states that, "[p]ursuant to Section 1711 of the New York State Education Law, you were suspended, effective immediately, from work until the next regularly scheduled Board meeting on October 6, 2010, at which time 3020-A charges will be submitted, considered and acted upon by the Board. You are allowed access to school property only with permission from me." (*Id.*). Plaintiff denies that he was suspended because of any misconduct, and he alleges instead that the main reason was his Article 78 proceeding regarding the Superintendent appointment. (Dkt. No. 193-1, p. 2).

### G. Section 3020-a Charges

On October 6, 2010, the Board filed charges against Plaintiff under Section 3020-a of the Education Law, thereby continuing his suspension. (Dkt. No. 193-4, pp. 43–55). The charges included "conduct demonstrating immoral character," insubordination, "conduct unbecoming an administrator," and incompetency; Plaintiff was accused of a litany of job performance issues, many of them previously identified in the counseling memos. (*Id.*). The charges were signed by Superintendent Dominick and Defendant Alley, the Board President. (*Id.*, p. 55). Plaintiff claims that the charges were filed in retaliation for his public criticisms and commencement of the first Article 78 proceeding. (Dkt. No. 193-1, p. 48).

### H. Second Article 78 Proceeding

On November 9, 2010, Plaintiff commenced a second Article 78 proceeding to challenge the Board's alleged on-going violations of the Open Meetings Law. *See Mtr. of Zehner v. Board*

*of Educ. of Jordan-Elbridge Cent. Sch. Dist.*, 927 N.Y.S.2d 820 (Table), 2011 WL 1549480 (N.Y. Sup. Ct. Jan. 20, 2011), *aff'd* 937 N.Y.S.2d 510 (4th Dep't 2012).  Among other things, Plaintiff alleged that the Board continued to meet improperly in Executive Session, thereby excluding the public.  *Id.*  In a decision dated January 20, 2011, the local court agreed that the Board had violated the Open Meetings Law and ordered the Board members to do training.  *Id.*

### I.  Board Meeting Activities

Plaintiff spoke at Board meetings on the following dates: October 6, 2010; October 20, 2010; November 4, 2010; November 17, 2010; December 1, 2010; and December 23, 2010, and January 5, 2011; and January 19, 2011.  (Dkt. No. 193-1, pp. 58, 102–04).  According to Plaintiff, his comments focused on the misconduct and waste of public resources by the Board. Among other things, he complained about the Board's actions towards former principal Schue and the ongoing violations of the Open Meetings Law.  (*Id.*, pp. 59–61).  Plaintiff also made negative comments about several Board members.  (*Id.*, p. 62).

### J.  Removal from Board Meeting

On January 19, 2011, Plaintiff attended another Board meeting and complained about continued violations of the Open Meetings Law.  (Dkt. No. 193-1, pp. 66–67).  The meeting was recorded on video.  (*See* Dkt. No. 195-1, ¶ 9, *http://www.youtube.com/watch?v=iza2BJqy8bI*). Plaintiff spoke on a variety of school matters in a mostly measured tone; toward the end of his speech, the Board interrupted because he exceeded the five-minute limit.  At that point, Plaintiff continued to speak, in a more elevated tone, as several other members of the audience started to yell at the Board.  Plaintiff spoke for approximately twenty more seconds and then returned to his seat, and many of the Board members left the room.  Around five minutes later, a uniformed police officer escorted Plaintiff from the room.  The video also shows several other members of

the public exceeding the time limit, but none were removed from the meeting. According to Plaintiff, the Board retaliated against him for voicing his concerns by forcibly removing him, with the feigned claim that he was disruptive and threatening. (Dkt. No. 193-1, pp. 66–68).

### K. Ban from School Functions

On January 28, 2011, Defendant Zacher, the interim Superintendent at the time, wrote a letter to Plaintiff stating that he was prohibited from attending any more Board meetings or any other activity or function on school premises. (Dkt. No. 166-1, pp. 49–50). Defendant Zacher's letter stated that Plaintiff was "extremely disruptive" at the January 19th Board meeting, and that he had conducted himself "in a highly inappropriate and unprofessional manner since October 2010," the time period when Plaintiff was suspended. (*Id.*). Further, Defendant Zacher wrote that Plaintiff was prohibited from entering on school property for any purpose, except with express written permission. (*Id.*).

### L. Third Article 78 Proceeding

On March 3, 2011, Plaintiff commenced another Article 78 proceeding to challenge the decisions to remove him from the Board meeting and ban him from school functions. (*See* Dkt. No. 166-3, p. 1). In a decision dated May 12, 2011, the local court noted that "the recording of the meeting submitted by the parties showed other members of the public who exceeded the time limits set forth by the board for public comment and who those who failed to exhibit proper decorum. None of those members were removed, nor presumably have they been banned from the property. However, the petitioner is not just a parent and taxpayer, but he is a suspended employee." (*Id.*, p. 5). The court ultimately found that Plaintiff's removal from the meeting did not violate the law, and that Plaintiff's request for relief pursuant to the Education Law was mooted by the filing of charges against him on April 12, 2011. (*Id.*, p. 7).

### M. Additional Charges Against Plaintiff

On April 12, 2011, the Board filed another set of charges against Plaintiff pursuant to Education Law § 3020-a, specifically: 1) "conduct demonstrating immoral character"; and 2) "conduct unbecoming an administrator"; and 3) insubordination. (Dkt. No. 214-22). Among other things, the Board alleged that Plaintiff disrupted Board meetings and disparaged members of the Board, and improperly directed teachers to change students' grades. (*Id.*). According to Plaintiff, these charges were retaliation for bringing the Article 78 action against the Board for continuing violations of the Open Meetings Law. (Dkt. No. 193-1, p. 57). Plaintiff also claims that the Board acted before receiving a report on the alleged grade changes, and that the report (dated April 22, 2011) almost entirely exonerated him. (*Id.*, pp. 107–11). The report, which was commissioned by the District, states that "[a]ll of the teachers said that it was ultimately their decision to determine if the student should pass or fail the course." (Dkt. No. 214-3, p. 9). The report concluded that "[a]lthough there have been numerous allegations of changes of grades by [Plaintiff], Kessler has only been provided with verbal proof of the changing of grades by faculty at JEHS." (*Id.*, p. 10).

On December 7, 2011, Defendant Froio (the new Superintendent) filed a "Part 83" complaint against Plaintiff with the New York State Education Department seeking to remove his administrative certification. (Dkt. No. 193-4, pp. 10–15). The complaint alleges that Plaintiff had "poor moral character unbecoming of a High School principal," for several reasons, including allegedly awarding high school diplomas to students short of credits, improper grade changes, and "exhibiting a pattern of poor judgments and behaviors." (*Id.*). Plaintiff denies these allegations and attributes them to retaliation. (Dkt. No. 193-1, p. 87).

## III.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 427 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).  However, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## IV.    DISCUSSION

As explained in the Court's previous decision, Plaintiff's claims are as follows: 1) First Amendment retaliation based on his protected speech on school matters of public concern, namely the concerns he voiced in Board meetings and the Article 78 proceedings challenging actions by the Board; 2) First Amendment retaliation based on his perceived association with certain former school employees; and 3) retaliation in violation section 3028-d of New York Education Law for reporting the District's allegedly illegal or inappropriate financial practices. (Dkt. No. 256, pp. 7–9).  Plaintiff alleges that Defendants retaliated against him with actions including counseling memos, disciplinary charges, suspension of employment, removal from a Board meeting, and a ban from school functions.  (*Id.*).  On summary judgment, Defendants made a number of arguments for dismissal of Plaintiff's retaliation claims, only some of which were addressed by the Court and on appeal.  Thus, a brief summary of the Second Circuit's decision is in order.

### A.  The Second Circuit's Decision

For Plaintiff's free speech retaliation claim, the Second Circuit found that there was a genuine issue of material fact on the element of causation, noting that "[n]ot even a month after instituting an Article 78 proceeding, in which Zehner alleged the Board violated New York's Open Meetings law—an allegation ultimately decided against the Board—Zehner was suspended and faced disciplinary charges," and that "the record reveals numerous other examples of the Board taking adverse actions against Zehner shortly after he engaged in protected speech."  (*See* Dkt. No. 261, p. 5).  The Circuit concluded that "a reasonable jury could infer that Zehner was retaliated against as a result of commencing the Article 78

proceeding and engaging in other activities protected by the First Amendment," and therefore, "summary judgment on the element of causation is inappropriate." (*Id.*).

The Circuit also found that "reasonable jurors could differ as to whether the Board would have suspended and disciplined Zehner in the absence of his protected First Amendment conduct." (*Id.*, p. 6). The Circuit observed that "[t]he evidence relied on by the Board— principally counseling memos and affidavits—merely show that the Board was concerned over rather minor and trivial issues involving Zehner." (*Id.*). It was noted that "only two memos, dated January 21, 2010 and March 23, 2010, mention possible further investigation and disciplinary action based on inappropriate comments to students," and that "the Board did not bring complaints against Zehner until approximately seven months after the issuance of these two memos and after Zehner had prevailed on his first Article 78 action." (*Id.*, pp. 6–7). The Circuit stated that "viewing the evidence in the light most favorable to Zehner, it is difficult to find a reasonable, non-retaliatory connection between Zehner's alleged misconduct and the actions the Board took against him." (*Id.*, p. 7). The Circuit added that "it should be left to a jury to determine whether the Board's justifications for its actions were merely pretext for retaliation in response to Zehner's protected conduct." (*Id.*).

The Circuit also disagreed "that the Board had a reasonable basis to ban [Zehner] from future Board meetings because of the potential disruptiveness of his speech," noting that "the Board has not shown how any resulting disruption might outweigh the importance of Zehner's speech." (*Id.*, pp. 8–9). The Circuit concluded that the Board thus "failed to carry its burden in this regard at this stage of the proceedings, and summary judgment on this basis is not warranted." (*Id.*, p. 9).

For Plaintiff's free association retaliation claim, the Circuit disagreed that he "had failed to demonstrate that he had engaged in any protected associational activities and that the Board would have taken the same actions in the absence of any protected association." (*Id.*, p. 8). The Circuit noted that a First Amendment retaliation may be based on a "perceived" association, and that reasonable jurors "could differ as to whether the Board would have suspended Zehner and filed disciplinary charges against him absent his alleged protected association." (*Id.*). The Circuit stated that "such facts need to be determined by the jury," and therefore, "entering summary judgment on this cause of action in favor of defendants was improper." (*Id.*).

Finally, the Circuit concluded that summary judgment was not warranted on Plaintiff's claim under Section 3028-d of the New York State Education Law, stating that: "citation to a specific law violated by the Board is not required under § 3028-d; rather, the 'whistleblower' statute merely requires a reasonable belief that the school board has engaged in illegal financial practices." (*Id.*, p. 9).

## B.  Additional Arguments

As noted by the Second Circuit, there are factual issues as to the causation and motive linking Plaintiff's protected activities and Defendants' adverse actions against him. Thus, summary judgment is not appropriate on these grounds. Nonetheless, the District Defendants and Defendant Zacher have also argued that Plaintiff's retaliation claims should be dismissed for separate reasons including: 1) lack of personal involvement; and 2) qualified immunity. (*See* Dkt. No. 170, pp. 24–28; Dkt. No. 162-11, pp. 6–16). Relatedly, Defendant Mevec argued that Plaintiff's claims against him should be dismissed because his role was limited to providing legal advice. (Dkt. No. 172, pp. 17–19). Since the Second Circuit did not address these issues, the Court will return to the record and do so now.

### 1) Personal Involvement[1]

Personal involvement of an individual defendant "in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). Indeed, "a defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). "Plaintiff must raise a genuine dispute as to whether 'each Government-official defendant, through the official's *own individual actions*, has violated the Constitution.'" *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016), *as amended* (Feb. 24, 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)) (emphasis added).

"Personal involvement may be shown by 'direct participation,' which requires in this context 'intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal.'" *Id.* at 67 (quoting *Provost*, 262 F.3d at 155). Alternatively, personal involvement may also be shown via several indirect methods, i.e. where: 1) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; 2) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; 3) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or 4) the defendant exhibited deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring. *See Shaw v. Prindle*, 661 F. App'x 16, 18 (2d Cir. 2016) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).

---

[1] It should be noted that government entities, such as Jordan-Elbridge Board of Education and Jordan-Elbridge Central School District, are not vicariously liable under Section 1983 for civil rights violations perpetrated by their employees. *See Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658, 694–95 (1978). To prevail on such a claim against these defendants, Plaintiff must identify and evidence a theory of liability based on "their own illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986).

### a. District Defendants

The District Defendants argue that "Plaintiff has not alleged actions of the individual defendants that are sufficient to keep them in this action."  (Dkt. No. 170, p. 27).  In response, Plaintiff points to his own testimony that Defendants Alley, Foote, Pieklik, Drake, and Feeney (all members of the school Board) were the "prime people that were trying to . . . orchestrate removal of certain people from the district."  (Dkt. No. 193-7, pp. 124–25).  Notably, none of these individuals authored any of the counseling memos issued to Plaintiff.  Nor did they issue the suspension letter dated September 21, 2010, which was signed by then-Superintendent Dominick.  (Dkt. No. 166-1, p. 2).  However, Dominick testified that she did not agree with the suspension and that several Board members wanted Plaintiff gone.  (Dkt. No. 193-8, pp. 15, 33). And there is evidence that the Defendant Board members all voted for the disciplinary charges against Plaintiff on October 6, 2010 (continuing his suspension) and April 12, 2011 (adding more charges).  (*See, e.g.*, Dkt. No. 193-4, pp. 105–08; Dkt. No. 193-14, p. 14; Dkt. No. 214-29, ¶¶ 9, 11; Dkt. No. 214-30, ¶¶ 9, 11; Dkt. No. 214-31, ¶¶ 9, 11; Dkt. No. 214-33, ¶¶ 9, 12; Dkt. No. 214-34, ¶¶ 9, 11).  Although the formal charges were not signed by all the Defendant Board members, "involvement as a voting member of the board may be sufficient personal involvement" where "the alleged deprivations occurred as a result of a board vote." *Ruston v. Town Bd. for Town of Skaneateles*, No. 06 Civ. 927, 2009 WL 3199194, at *4, 2009 U.S. Dist. LEXIS 90964, at *12 (N.D.N.Y. Sept. 30, 2009), *aff'd*, 610 F.3d 55 (2d Cir. 2010).  Therefore, the votes of the Defendant Board members in the alleged adverse actions against Plaintiff constitutes sufficient personal involvement in this case.

As to Defendant Froio, the record shows that he became Superintendent on July 1, 2011. (Dkt. No. 214-32, ¶ 2).  There is evidence of his personal involvement in the Part 83 complaint

against Plaintiff filed on December 7, 2011 with the New York State Education Department. (Dkt. No. 193-4, pp. 10–15). Thus, Plaintiff may proceed with his retaliation claims against Defendant Froio related to that alleged adverse action.

### b.  Defendant Zacher

The allegations against Defendant Zacher (Superintendent from November 3, 2010 to May 13, 2011) are limited to three incidents: 1) Plaintiff's removal from the January 19, 2011 Board meeting; 2) the January 28, 2011 letter banning Plaintiff from school functions; and 3) the issuance of disciplinary charges against Plaintiff on April 12, 2011. (*See* Dkt. No. 195-1, pp. 3–4). Defendant Zacher testified that "[t]he Board of Education determines policy and oversees the Superintendent of Schools but the Superintendent of Schools in most cases is rightly considered to be the chief school officer of the district." (Dkt. No. 162-4, p. 99). He agreed that the Superintendent is "generally responsible for executing and following through on the policies that are set by the Board of Education." (*Id.*). Defendant Zacher testified that, while he was at the January 19, 2011 Board meeting, it was Defendant Alley (the Board president) who ordered Plaintiff's removal. (*Id.*, pp. 124–25). As to the other incidents, the record shows that Defendant Zacher signed the January 28, 2011 letter and the April 12, 2011 disciplinary charges. (Dkt. No. 166-1, pp. 49–50; Dkt. No. 214-22, p. 10). Thus, Plaintiff may proceed with his retaliation claims against Defendant Zacher related to these alleged adverse actions.

### c.  Defendant Mevec

Defendant Mevec argues that his role in the events in this case "was limited to his position as attorney for the District." (Dkt. No. 172, p. 19). Essentially, Defendant Mevec claims that he did not directly participate in any of the alleged constitutional deprivations since he merely provided legal advice to others. In response, Plaintiff asserts that "Mevec's

involvement far exceeded that of a school attorney representing his client and giving advice to his client." (Dkt. No. 193, p. 9). Plaintiff claims that Defendant Mevec colluded with the Board to seek to unlawfully terminate his employment. (*Id.*, p. 19). But absence evidence that Defendant Mevec directly participated in the decisions made by the Board and Superintendent, Plaintiff's allegations are insufficient to show personal involvement. Accordingly, Plaintiff's claims against Defendant Mevec must be dismissed.[2] *See 33 Seminary LLC v. City of Binghamton*, 120 F. Supp. 3d 223, 257 (N.D.N.Y. 2015) (find that defendant attorney lacked personal involvement in the alleged constitutional violations where he "was not a voting member of either the ZBA or Planning Commission, and did not otherwise participate in the ZBA and Planning Commission's activity other than providing legal advice"); *Zdziebloski v. Town of E. Greenbush, N.Y.*, 336 F. Supp. 2d 194, 202 (N.D.N.Y. 2004) ("According to Zdziebloski, Town Attorney Maney served as an advisor to the Board Members, drafted the release for Zdziebloski to sign to get his compensation, and investigated the allegations . . . . However, each of the decisions about which Zdziebloski complains are decisions made by a vote of the Board. As Maney was not a voting member of the Board, none of his participation was sufficiently direct to create liability for § 1983 purposes. His position as a legal advisor to the Board is insufficient. Involvement in discussions that lead to a decision is not personal involvement under § 1983.").

### 2) Qualified Immunity

 "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, ___U.S.___, 137 S. Ct. 548, 551 (2017) (per curiam) (internal quotation marks

---

[2] Further, the Court has reviewed the record and found no evidence to support any other theory of personal involvement by Defendant Mevec.

omitted).  "Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law."  *Garcia v. Does*, 779 F.3d 84, 92 (quoting *Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir. 2007)); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Where the relevant facts are not in dispute, the Court can decide qualified immunity as a matter of law.  *See Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990).

"Though the qualified immunity inquiry is generally an objective one, a defendant's subjective intent is indeed relevant in motive-based constitutional torts."  *Johnson v. Ganim*, 342 F.3d 105, 117 (2d Cir. 2003).  "Otherwise, defendants in such cases would always be immunized from liability so long as they could point to objective evidence showing that a reasonable official could have acted on legitimate grounds."  *Id.*  "Where a factual issue exists on the issue of motive or intent, a defendant's motion for summary judgment on the basis of qualified immunity must fail."  *Id.* (citing *Locurto v. Safir*, 264 F.3d 154, 170 (2d Cir. 2001)); *see also Sheppard v. Beerman*, 94 F.3d 823, 828 (2d Cir. 1996) (stating that "the employer's actual (subjective) motive is *not* irrelevant in a qualified immunity inquiry" on a First Amendment retaliation claim) (emphasis in original).

### a.  The District Defendants

The District Defendants contend that they are entitled to qualified immunity because their actions were "objectively reasonable" in filing disciplinary charges against Plaintiff and a complaint with the State Education Department, mostly because they consulted with legal counsel and an investigator about the allegations against Plaintiff.  (Dkt. No. 170, pp. 24–27).

However, there is evidence that suggests these measures were intended to mask improper retaliation. For example, the record shows that the Board filed disciplinary charges against Plaintiff on April 12, 2011—before even receiving the report from the investigator dated April 22, 2011. (*See* Dkt. Nos. 214-22, 214-3). According to Plaintiff, the charges were retaliation for bringing an Article 78 action against the Board. (Dkt. No. 193-1, p. 57). The record shows that action was filed on March 3, 2011, shortly before the April 12, 2011 charges. (*See* Dkt. No. 166-3). Indeed, there is close proximity between Plaintiff's protected speech and several adverse actions in this case. Moreover, former Superintendent Dominick's testimony indicates that a retaliatory animus may have motivated these actions: she said that "several board members really wanted Mr. Zehner gone and asked that we begin writing things up and making a case," and that the grade audit "came out of nowhere, and I felt like there was no other explanation and they wanted another nail [for Plaintiff]." (Dkt. No. 193-8, pp. 15, 33). In addition, there is evidence that Defendant Froio filed the Part 83 complaint against Plaintiff in December 2011, alleging that he made improper grade changes, almost a year after receiving the investigator's report which failed to substantiate that claim. (*See* Dkt. No. 193-4, pp. 10–15).

Based on this evidence, there is an issue of fact as to the motive for the Defendants' actions against Plaintiff. Viewing the facts in the light most favorable to Plaintiff, the District Defendants acted purposely to punish Plaintiff and push him out as principal for speaking about school issues of public concern. Under those circumstances, they could not have reasonably believed that their actions were lawful because it is clearly established that a school employee has a right to be free from retaliation for protected speech. *See Nagle v. Marron*, 663 F.3d 100, 115 (2d Cir. 2011). Accordingly, the District Defendants are not entitled to qualified immunity. *See id.* (finding that qualified immunity did not apply where school officials "knew or should

have known that retaliation for protected speech would violate an employee's First Amendment rights"); *Velez v. Levy*, 401 F.3d 75, 102 (2d Cir. 2005) ("Accordingly, if it is true, as asserted by Velez, that Levy acted deliberately to bring about Velez's removal in retaliation for her political views, he cannot avail himself of qualified immunity."); *Lilly v. Lewiston-Porter Cent. Sch. Dist.*, 853 F. Supp. 2d 346, 358 (W.D.N.Y. 2011) (finding that defendant school board president was not entitled to qualified immunity on retaliation claim); *Valenti v. Torrington Bd. of Educ.*, 601 F. Supp. 2d 427, 441 (D. Conn. 2009) (finding that the defendant principal was not entitled to qualified immunity on retaliation claim); *Lorusso v. Borer*, 359 F. Supp. 2d 121, 130 (D. Conn. 2005) ("Plaintiffs have raised disputed issues of material fact regarding their underlying First Amendment political retaliation claim and Mayor Borer's alleged actions against them, and thus summary judgment on qualified immunity grounds is not appropriate."); *DePace v. Flaherty*, 183 F. Supp. 2d 633, 642 (S.D.N.Y. 2002) ("It would have been objectively unreasonable for Flaherty to believe that adverse employment action against and unequal treatment of an employee who exercised his First Amendment rights was permissible.").

### b. Defendant Zacher

Defendant Zacher's qualified immunity arguments are unavailing for the same reasons. (*See* Dkt. No. 162-11, pp. 4–10). Defendant Zacher suggests that his actions were objectively reasonable and did not violate clearly established law. (*Id.*). As discussed above, there is evidence that Defendant Zacher participated in two alleged adverse actions against Plaintiff: the January 28, 2011 ban from school functions and the disciplinary charges on April 12, 2011. Because the motivation for these actions remains in dispute, Defendant Zacher is not entitled to qualified immunity. *See Johnson*, 342 F.3d at 117; *Locurto*, 264 F.3d at 170.

### 3) Remaining Arguments

Finally, the Court has reviewed the other remaining arguments in Defendants' summary judgment papers and finds them lacking in merit. As discussed above, there are issues of fact as to Plaintiff's retaliation claims which a jury will have to resolve at trial.

## V. CONCLUSION

For these reasons, it is

**ORDERED** that after consideration of the additional arguments in Defendants' motions for summary judgment (Dkt. Nos. 162, 164, 172), it is now

**ORDERED** that Plaintiff's claims against Defendant Mevec are dismissed and he is dismissed from this action; and it is further

**ORDERED** that Plaintiff's retaliation claims may proceed as against the District Defendants and Defendant Zacher, as discussed in this decision; and it is further

**ORDERED** that the Clerk of the Court is directed to provide a copy of this Memorandum-Decision and Order to the parties in accordance with the Local Rules of the Northern District of New York; and it is further

**ORDERED** that the Clerk of the Court is directed to confer with the parties to schedule a status conference in preparation for trial.

**IT IS SO ORDERED.**

Dated: August 29, 2019
      Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge